Harrison v. Wells Fargo, Mr. Hawkins. Good morning, Your Honors. May it please the Court. I'm Richard Hawkins. I'm here on behalf of the Appellant Plaintiff, Nancy Harrison, who is in the courtroom here today. I am here and I will be addressing the substantive issues, the substantive unreasonableness of the denial of benefits in this case, and I will be ceding seven minutes of my time to Ms. Gail Perry, who is sitting at the counsel table. She will be presenting the procedural unreasonableness arguments on behalf of the Department of Labor. Your Honors, this is an ERISA case. It's an ERISA denial of benefits case involving a woman, Ms. Harrison, who suffered from severe and extensive thyroid disease. That thyroid disease required her to undergo a six-month, three-procedure treatment plan. It was coextensive. It was all part of a cohesive plan on the part of her three treating physicians, and it required her to undergo three very specific procedures, a bronchoscopy, a thyroidectomy, and a sternotomy. Each of these procedures was designed to assess the thyroid condition and then subsequently to remove the thyroid masses, none of which, well, all of which were finally removed in completeness after the end of the sternotomy, which of course is the breaking open of the breastplate and the removing of the mass that was required or the mass that was existing in her. What's the period of time at issue here? Well, that's a very good question. If you review the denial letters, what Wells Fargo was focused on was a period of time between 9-11-2011 and October 31st of 2011, so roughly six and a half weeks. If you review even the independent medical evaluation or independent file review by Dr. Gerstenblatt, even he conceded that she was disabled and impaired and unable to work at her job from the time of the sternotomy through the recovery period. It's our contention that she was disabled throughout this entire period. I understand that, but the period of contest was six and a half weeks. That is correct. That is correct. They agreed she got the short-term disability benefits up until 9-11, and then she got them again after 10-31? No, she never did get them again. That's part of the problem here because what Wells Fargo told Ms. Harrison is that she had to return to work in order to requalify. So when she was unable... Six and a half weeks was not the period of substantive requalification. Well, that's the disputed period. From a payment standpoint and from a claim standpoint, she was never paid any benefits after 9-11-2011. So assuming that the denial is unreasonable for that period of time... When was the second surgery? It was on August 17th, 2011. That was the thyroidectomy. Oh, that was the first surgery. My apologies. That was the first surgery. Yes, it was. The second surgery, when was the second? When they broke open her chest, when was the second surgery? October 31st. October 31st. Yes. And what was the period of recovery from that? Through December, mid-December. They said she should have gone to work on November 1. You just said she was supposed to go to work after the surgery. They said she was supposed to go to work after the thyroidectomy, the first surgery. Well, but they gave her... You said she didn't get any benefits after 10-31. Correct. Because she failed to bridge the gap, she never was entitled to recover even for the subsequent period. So what Wells Fargo concluded was that because she was, quote, able to go back to work in that time frame, she was then not able to requalify for short-term disability benefits as of October. And by definition, she was then not eligible to seek long-term disability benefits because by then, she was suffering from severe post-traumatic stress disorder and would have remained disabled. And if you look at, I believe it's Joint Appendix page 55 and 54, you'll see... The second surgery sounds like it's a lot more serious than the first one. They were both serious. I know they were both serious, but the second one sounds... When you cut open somebody's chest, that sounds... To me, I'm not much about it, but it sounds like it's a pretty serious deal. That's what they do with people, as I understand it, when they have open heart surgery and that kind of thing. It is. It is. And they did that the second time. That is correct. But I would like to emphasize that the first surgery was far from routine. I know all that. I understand that. I mean, I understand that. That was a thyroidectomy. It was. And it took out the thyroid, but if the court examines the pathology report... Is that not a surgery? That was not the bronchoscopy of what it was? It was a bronchoscopy. They put a scope down her throat in order to assess what was going on. There was a diagnostic too? Yes, sir. Yes, sir. And she was considered disabled following that procedure because of the thyroid mass that was still existing that was pressing on her chest and that was pressing on her trachea. And Judge King, with respect to the sternotomy, the pathology report in that case revealed that the masses removed at that time were significant and had been, in the words of Dr. Hollings, pressing upon her trachea and causing significant tracheal compression. Which surgery are you talking about there? That's the second. What's important... That's the October 31st surgery. Yes. And this is in the record at J374 and 375. And what's important about that fact is that between the time of the thyroidectomy and the time of the sternotomy, those masses were existing inside of Ms. Harrison and were pressing upon her and she was raising complaints of chest pain. And in fact, during that time, she was on Percocet in order to relieve the pain. And I think... There's a procedural question that needs to be addressed before we get to the substantive question and that is whether the plan administrators really resolve this on a full record. There is. They've got to give a full and fair explanation. They do. And... The denial of benefits is a threshold question, it seems to me, as to... It's a difficult question, but whether there was a full record here? There is. I will defer to some degree to Ms. Perry on that. But what I would say is that from a substantive standpoint, because that procedural matter deals primarily with when we're talking about this bridge the gap period, the evidence is overwhelming. The medical evidence is overwhelming that she was suffering from symptoms that were directly tied to her objectively medically verifiable conditions. And to borrow your words, Judge Wilkinson, from the White v. Sunlight case, her pain was no phantom syndrome. It was directly attributable. You know, I'm a little bit cautious about just jumping right into this to the substantive question without understanding whether there was even a decision made on a full record. And I want you to help me out with respect to the question of whether the plan administrator should have been aware of the visitations and the like that she was paying to Dr. Glenn. I mean, I'm interested in that. What do you say about that? They should have. They absolutely should. Why do you say that? Tell me why you think they should have been aware of her visitations with Dr. Glenn. Well, because she had provided them the direct contact information for Dr. Glenn. She gave that to them in their appeal. And when she does that, she puts them on notice. She says, I'm going to see this doctor. And the peer reviewer had information about Dr. Glenn as well, did he not? No, sir. And in fact, if you take the record and look at Joint Appendix 44, you will see an email from the... I thought there was a psychiatric peer reviewer... Yes, sir. ...who, in the course of conversation with the treating physician, had the treatment with Dr. Glenn brought to his attention. Yes, sir. Yes, sir. What you're saying is that there are two instances where they should have been aware of the fact that her husband died, isn't that correct, during this whole period? Correct. July 1st, her husband died. And from that period forward, she remained with her sister. Yes. And so during this period, she was going to a psychiatrist for depression, which was brought on as a result of the surgeries, plus her husband's passing, which is a lot to hit somebody with at one time, serial surgeries and your spouse passes away. And, you know, what I'm concerned about here is whether trustees, having trustees make decisions based upon a full record. And as I understand, a big part of your claim is they should have had Dr. Glenn's records before them, because a lot of times, physical and psychological and psychiatric conditions interact. Yes. Yes, Your Honor. And I'm not sure that they considered Dr. Glenn's records and she brought it to their attention. She did. Your Honor, my time is complete here. I'd like to turn it over to Ms. Perry. We need to hear first from Ms. Perry. Good morning. My name is Gail Perry and I'm here representing the U.S. Secretary of Labor with respect to the amicus, our participation as amicus curiae. Your Honor, let me get right to the point. We probably would not be here on the psychological issue if Wells Fargo and or Liberty had just picked up the phone. This information was given to them on several occasions. On September 16th, when Ms. Harrison talks to someone from Liberty and they're going to send a denial letter that day, they received Dr. Patrizia's report who said, I'm not releasing her. This woman suffers from depression. I have her on Lexaprol. I have her on certain medications. I've also made a referral to Dr. Glenn. What's really disturbing here is when the psychological review and support and the record supports it, it was just overlooked. By March of 2012, they could not have their denial committee meeting because they had overlooked it. So they asked for a 45- But you're saying, what you're saying is that the record here bears out that on several occasions, both to the peer reviewer and from the treating physician, and I suppose from the plaintiff herself, had indicated that she was in the care, not only of her treating physician and not only for physical ailments, but also in the care of a psychiatrist for a really traumatic event. Because when you look at this record as a whole, what happened here is she was undergoing a diagnostic procedure and then she was undergoing two different surgeries. Her husband passes away. She's under the care of a psychiatrist that's been brought to the plan administrator's attention. And as far as I can see, they didn't consider it. They did not consider it. And it might have made a real difference as to whether somebody could return to work if they suffer this series of blows. I mean, that's a hard thing to hit any human being. Well, at least to have the information in order to make that assessment. And her psychological condition was an essential function of her job. So in order to be considered disabled or short-term disability, you were disqualified. You were followed by her. The point you're making is it isn't just a generalized complaint of depression. It's tied to something. It's tied to the death of a spouse and compounded with a series of medical treatments. And what you're saying is you've got to consider the whole record or you can't meet ERISA's requirement of a full and fair statement of reason. Yes. It was not a full and fair review for several reasons, and that being the primary one. You know, the appellees would have you consider that they suggest that maybe Ms. Harrison was not seeing Dr. Glenn, that maybe she wasn't seeing him during the operative time. But that's easily found out. Pick up the phone. When they made the referral to the peer review psychiatrist to look, they only provided Dr. Petrizzi's medical records. They didn't even provide Dr. Glenn's phone contact number. It is during that time that Dr. Daniels finds out from Petrizzi that, look, you have to talk to this psychiatrist. Do you think this is a case of willful blindness here? Well, I don't know if it's willful blindness, but I know it's not well reasoned and well principled, especially when everyone knows there's a conflict of interest here, which provides one of the factors to be weighed. So what happened was the district court said, neither side has great evidence. Both sides are lacking. However, I'm going to default and say that the burden was on the appellant. They need to take account of evidence and medical evidence which has been brought to their attention. Correct. And even on the medical evidence, as Mr. Hawkins had argued, on the medical, there was sufficient evidence to have a finding. But the district court said, oh, it's lacking, except for Dr. Hollings. And Dr. Hollings, as of after that October 31st surgery, says, this woman continues to be ill and having medical issues. But if they didn't find it on that- An important point here to have ERISA decisions made on a full medical record. On a full medical record, full and fair review. And because of that conflict, the PA is, well, under the plan document, interestingly, and this is what I'm going to tell you, the district court said, the plan document says the burden is on the plaintiff or the claimant. And actually, no, the plan document in several places also places the burden on the plan  That if they have- You're saying the burden's on everybody? Basically. I think the first step is that the claimant has to provide all the information to support her claim. But in looking at that information, if you have questions, then the burden is on the fiduciary to ask for it. And there are several cases, not only in the 10th circuit for Gaither, but also in the 7th and the 9th, as well as the 4th circuit. The 4th circuit cases found that, but for this overwhelming evidence of the treating physician saying, yes, the claimant can go back to work and go back to work part-time, or there's overwhelming evidence that the claimant could return to work, then there's not an obligation to seek further. There's no fishing explanation here. You're saying this would have a material impact on the claim? Yes. This would have a material impact on the claim, especially when they have that information. Now, the records do not support that she was ever specifically asked to provide Dr. Glenn's records. They just said, have you given us everything? And she said, yes. So the assumption shouldn't be that it's fraud. I'm sorry. I see my time is up. May I finish my point? The assumption shouldn't be that this is fraud or that she was withholding things. ERISA requires for a full and fair review. And Section 503 and 404, the prudence reviolations, call for a collaborative process, not adversarial. And this was clearly an adversarial process. And I have to say that that conflict of interest part should have been a factor with the district court weighing whether to put the burden totally on the claimant versus looking at any responsibility that the plan administrator as a fiduciary, a fiduciary with the obligation to pay legitimate claims, to seek out information and investigate to pay legitimate claims. That is the point of ERISA and the claims reg. And as I said, if you look at Chapter 9 of the plan document, you will see all the provisions in which procedurally Wells Fargo failed to follow, even with respect to those denial letters. Let me ask you a question. Yes. Once she filed suit on May 2, 2013, did the plan administrator ever indicate that they didn't think they had a full record, that she needed to supply more records? You understand what I'm saying? I do understand what you're saying. Did they ever challenge whether or not they had a full and fair review to consider? Well, they clearly thought so in their summary judgment decision. And summary judgment was just not appropriate here. There were too many disputed issues of fact. It wouldn't go before a jury. No, it doesn't go before a jury. It is a claims bill before a judge. Judge Hamilton, do you have some further questions? No. No, thank you. Thank you for your time. Thank you. Mr. Rust, we'd be happy to hear from you, sir. Thank you, Your Honor. Dana Rust with McGuire Woods on behalf of Wells Fargo. The first thing I'd like to do is just acknowledge the tragic circumstances that Ms. Harrison faced here. We don't want to ignore those. We don't want to minimize those in any respect. It's hard not to come across as uncaring when you're in my position, but we do care. Having said that, the district court was correct. Wells Fargo did not abuse its discretion when it concluded that Ms. Harrison was not entitled to short-term disability benefits during that window of time between September 11th and October 31st. And the first thing I'd like to do now is address Judge Wilkinson's point about the process. This is an erisic case. You have to start with the plan when you have an erisic case. The U.S. Supreme Court said that over and over again in McCutcheon and other cases. The plan squarely places the obligation to produce medical records on the plaintiff. It's in pages 481, 484, and 485 of the Joint Appendix. It says it over and over and over again that it is her obligation to provide the medical records to us. It couldn't be more clear. But Wells Fargo and its claims administrator, Liberty Life, did much, much, much more than that other than simply rely on the plan documents. In the administrative record, there are multiple references to efforts on the part of Liberty Life's claim manager to advise Ms. Harrison of her obligation to provide any records that she had to them to consider during the appeal. And it's also very important to know, and Judge King, you raised, I'm sorry. What about the contact information that she provided? If she had not, would your point be more persuasive if there wasn't any contact information provided for Dr. Glenn or if the peer reviewer did not learn of Dr. Glenn and his conversations with Dr. Patrizzi or the claimant's treating physician here? Wouldn't there have been some, if they knew of Dr. Glenn, wouldn't the treating physician, I mean, wouldn't the peer reviewers at least have benefited from that information? It's hard to know, Your Honor, because of the timing of all this. And that's a point that I wanted to address for Judge King. So the period, the window in time that's not covered here where she was deemed not to be disabled is just from September 11th to October 31st. As of October- So you say it is just six and a half weeks? Yes, just- What happened after October 31st? After she had that second, more serious, I thought, surgery? I think it was more serious, Your Honor. And I think what would have happened is if she had gone back to work, then she would have been able to reapply. You think she should have gone back to work on the 1st of November? No, no, no. I'm sorry. Between September 11th and October 31st, if she had done that- No, but she had the surgery on October 31st. Until this- You're not saying she should have gone back to work on 1st of November. No, no, no. No, I'm saying she should have gone back to work between the two surgeries after the recovery period.  We did not credit Dr. Patrizzi's- You didn't credit him? On the psych issue. Well, but he said on June the 15th that she should not return to work until surgery for thyroid mass is complete, unquote. Yes, and that- All right, surgery for thyroid mass is complete. And that surgery was, you all say, one surgery, August 17th. And they didn't complete it on August 17th. They had a second surgery on October the 31st. It was two operations. He didn't say one until the first surgery is complete, if we need to. He said until surgery for the thyroid mass is complete. They didn't get the thyroid mass out of there. They had to go back in on October 31st. So he said she can't go to work. The way I read that, until October 31st or after, I assume, after some reasonable recovery after October 31st. At the time that- Would you say that there would be some reasonable period to recover after October 31st? Right, we're not here to contest- What is the reasonable period to recover after the second operation? I think it's six weeks. I think it's- Six weeks? I think it's six weeks. But your honor, just to be- Just before Christmas. Just to be clear, there was no expectation that they were going to need that second surgery until they went in and- Well, there wasn't an expectation, but they knew it after the first surgery. And you all don't explain anywhere how you justify saying it's only one operation, even though that operation was incomplete, is what Dr. Patrizzi meant. We never rationalize that, that I can find anywhere in here. And if you do, just point it out to me. How do you rationalize that proposition, your position here being consistent with what Dr. Patrizzi said on June the 15th? Yeah. They said they went in there for a thyroid ectomy. They didn't finish it. They said there's a big mass in there and we can't get to it. We got to go in and crack open their chest bone and have a second surgery. And that's exactly what they did. And you're saying that between those two surgeries, the lady is not short-term disabled. Right. Between those two surgeries. Correct. Correct. And this is why, Your Honor, after the first surgery on August 17th, her first post-op examination by the surgeon after that, he described her as only having moderate chest pain and doing well. In the next visit, he said she only had mild chest pain and was doing better still. The standard recovery period is two weeks. She was given three weeks. She had a normal heart rhythm test. She had a normal chest scan. There were no further workups reported for chest pain. The surgery removing her thyroid was described as successful. So for all those reasons. They got the thyroid out, but they didn't get the mass out. Right. But the mass, the letter he writes on June the 15th refers to the thyroid mass. Not the thyroid. The thyroid mass. Are you saying that was taken out on August the 17th? The thyroid mass. I think the thyroid was removed on the 17th. And the thyroid mass was removed in October. I believe there was some additional tissue. After they ripped open her chest. Right. Let me refer you to the record. On August 25, 2011, Harrison informed Liberty that she needed to have a second surgery sometime in October of 2011 to remove the remaining mass in her chest as joint appendix at 35. That's right, Your Honor. They were initially trying to treat it with medication to see if they could shrink the mass in her chest without a second operation. But then they concluded that that second operation would be necessary. But again, for all the reasons I just mentioned, the plan concluded that she could have come back to work for that brief period of time, six or seven weeks between October. I'm sorry, September 11th and October 31st. So you explain somewhere in here why Dr. Patrizzi was wrong on June the 15th? All those reasons. That he was incorrect when he said she needs to, should not be at work until the surgery for the thyroid mass is complete. Judge Hamilton just explained to you that a week after that August 17th surgery, she explained, she told you that she had to go back in in October to get the rest of it. They referred to it as the thyroid mass. All those reasons I just mentioned. And in between the two surgeries, she was deemed to be doing much better and improving every step of the way. And again, an assessment of her pain, first as moderate, then as mild, standard recovery period, normal heart test, normal chest scan, no further workups reported for chest pain needed during that time period. I mean, I'm not sure it's our obligation in the first, we can just simply reweigh the medical evidence. I'm not sure we can do that. But what concerns me is you say she had the obligation to provide all the available medical records. And I'm sure that's true, particularly given the high degree of confidentiality between a patient and a psychiatrist or the plan administrator would have wanted to work through her. But why wouldn't it have been possible for you to say to her, you provided this contact information for Dr. Glenn, but we have no records and we will need the records here and get her to provide them by going to Dr. Glenn. And why couldn't you take that simple step? And we did just that. If you look at page 32 of the Joint Appendix, the very first time that Ms. Harrison mentioned the psychiatric issue was when she was being told that the claim was denied on the surgery. And when she was told that in a phone call from the case manager, and they document all this in their computer files for all this, and you can go to page 32 of the Joint Appendix and see it, the nurse case manager was told that her husband had died and she gave her her condolences as you would expect. And then she said to her in that same phone call, she said, well, look, Dr. Patrizzi hasn't documented anything to say that you've got a psychiatric issue. So you, in fact, he said your mental health exam was fine. So you should go back to him and get him to take another look at that. She specifically told him that in that phone call. Ms. Harrison goes back to Dr. Patrizzi at that point a couple weeks later on October 5th, and they have an examination. And again, she hasn't even begun to see Dr. Glenn yet. So we can't be faulted for not having Dr. Glenn's records or ask him because we don't even know about him yet. In that examination on October 5th, Dr. Patrizzi says she's going to be seeing a local psychologist. He doesn't identify. When did her husband pass away? July 1st. July 1st. Now, when you made the decision, were you aware of the fact that her husband had passed away? No, not the initial denial. Because again, in that phone call where the case manager tells her that they're terminating her benefits, that's when she says for the first time, my husband died and I'm having a hard time. I'm struggling with it. Did you, when there was the different stages of peer review, independent peer review, did you have the information that her husband had passed away? Yeah, yes. So on October 18th, and again, this is near the end of that window, if you're going to adopt the window from September 11th to October 31st, Ms. Harrison sends a letter in to Liberty Life and says, I'm planning to see Dr. Glenn. So as of October 18th, she still had not yet seen Dr. Glenn. Let me refer you to the record again. On October 6th, Dr. Patrizzi wrote a letter, in part it says, she now has developed significant anxiety and will be seeing a local psychologist. All these issues have resulted in her inability to return to work. That's a joint appendix at 137. Now, insofar as Dr. Glenn is concerned, Harrison did not submit any records from Dr. Glenn or any other psychologist. However, she did provide contact information for Dr. Glenn. That's a joint appendix at 291. Now, what did Liberty do with that contact information? Did they contact Dr. Glenn? There's nothing in the record to suggest, Judge Hamilton, that they did reach out to Dr. Glenn. What they did was they went back to the claimant, and they told her, it's your obligation to get us the records under the plan. On October 21st... To follow up on Judge Hamilton's question, would there have been anything improper about them saying, we're surveying this, we'd like to have the records from you, and then Dr. Glenn can obtain Ms. Harrison's consent to release those records. What I'm concerned about is having a decision made without a very important material fact omitted. In your statement of reasons, is there any mention at all, or what mention is made of the course of psychiatric treatment she was receiving and of the fact of her husband's passing? Was that a part of the decisional calculus? Was it a part of the statement of reasons? The psychiatric peer review doctor, Judge Wilkinson, did comment on the following. He said that she had a history of depression and was able to work with that history of depression before her husband passed away. She had been on antidepressants, and had a history of that, and worked with those before her... Did it talk specifically about Dr. Glenn, or did it talk specifically about the fact that her husband passed away? It talked about the fact her husband passed away. And he mentioned that there was a Dr. Glenn... The course of treatment she was undergoing with Dr. Glenn. It mentions that she has said she's going to see a Dr. Glenn, but he did not reach out to Dr. Glenn. If you had known about the combination of the surgeries, plus the psychiatric treatment, plus the traumatic event in her personal life, wouldn't that have made a difference in your assessment of whether somebody is able to return to work? I mean, these don't strike me as general ideas, general concerns of malingering or anything else. They're very specific. Somebody's spouse dies, and somebody is facing surgery. And if you had both of those facts, and put the fact that her husband had passed away front and center, that she was undergoing psychiatric treatment at this particular time, that she was awaiting surgery, wouldn't all those facts in their totality have influenced your decision? A couple of points, Your Honor. First of all, the plan document says what it says. And this is an arresting case. And you have to follow the plan. What are you saying, a psychiatrist can't provide a medically certified health condition? No, what I'm saying is when the plan puts the burden on the claimant to provide the medical records, and she's told of that repeatedly over and over. Well, I understand that. I understand that the plan puts the burden on the plaintiff to provide the medical records. But, you know, the plan puts the burden on the plan administrator, or the statute puts the burden on the plan administrator to give a full and fair explanation of the reasons. And where there's a conflict between the plan and the statute, the statute has to control. You can't draw a plan document that just overruled ERISA obligations of explanation. And that's... Absolutely, Your Honor. We agree with that. You have to have a full and fair review. But the plan may absolutely require the claimant to provide the medical records. And virtually every plan in the country does that. And once they get you those records, then you have the full and fair review. But there was nothing wrong on the part of Wells Fargo to put the obligation on her to get those. And it told her over and over and over to do it. And the plan documents told her to do it. And the denial letters told her to do it. And she partially did it. After she heard from them, she sent medical records in from other doctors, just not Dr. Glenn. So that begs the question, why not Dr. Glenn? And I think the answer to that is because she hadn't seen him yet. Or if she had seen him, she had just seen him very, very late in the process. But I caution the court... Was made after she had visited him and was undergoing a series of consultations with him. We don't know when she saw him. We just know the following from the administrative record. We know that as of October 18th, she was still using the future tense and saying, I have an appointment coming up with him. Okay. So we don't know if she ever saw him before October 31st. Did Liberty have all of Dr. Patrese's records? I'm sorry, Judge Hamilton? Yes. Did Liberty have all of Dr. Patrese's records? Yes. They did? Yes. Well, it would seem to me like, based on the detailed information that he went into, that that alone would be sufficient to justify the short-term disability that is under dispute here. On the psych issue, Your Honor, I would disagree with you on that. He's got one line. What's the psych issue going to add to this? I'm talking about the medical condition primarily having to do with the thyroid mass that's in her chest that's requiring another surgery. I don't see why that alone wouldn't be sufficient to justify the short-term benefits that are under dispute here. And on that point, Your Honor, I don't want to beat a dead horse, but I did tick off those medical records that were in our hands at the time. And I'd also like to point out two other things. She has the burden of proof under the plan to demonstrate that she's entitled to benefits. And then she also has a higher burden of proving that the plan abused its discretion. And under the circumstances here where you had a nurse case manager look at it, you had two independent peer review doctors look at it. And those records that I just described a minute ago, I don't think you can conclude there was an abuse of discretion. I think Judge Benser did a good job of walking through that in his opinion and explaining why there was no abuse of discretion. It was a close case. I agree. I don't challenge that. It could have gone either way. But the plan has discretion in interpreting the plan terms. And then once it does so, its decision is afforded a great deal of deference under Firestone  Judge Benser didn't see it here. But they misapprehend the facts. That is by definition an abuse of discretion. And they seem to have misapprehended what Dr. Patrese said on June the 15th. She couldn't return to work until surgery for the thyroid mass was completed. And that was completed on October 31st under the facts of this. I see my time's up, Your Honor. Sure, go ahead. Again, going into the operation, Your Honor, they thought it was just going to be one, not two. And it was two operations. And there was an ample period of time for her to recover between the two. That's what your people thought. It was going to be one operation rather than two. But Dr. Patrese didn't say anything about one operation or two operations. He said until the thyroid mass surgery is complete. I think. And he said again, what is on August 25th, Judge Hamilton gave you the date. Eight days after the first surgery, we've got to do it again. We've got to have another surgery because the mass could not be removed. The first surgery was insufficient. Didn't do it. Had to go back. You all knew all about that. We did know that, Your Honor. But we had all this other evidence that suggested that she had recovered enough to be able to go back to work between the two surgeries. Again, we have to preserve the plan assets for a lot of people. You have to preserve the plan, but you're also fiduciary for her, right? Absolutely. You have to act for her benefit. Absolutely. And along those lines, they told her repeatedly what she should do to get her records to us. So you can't fault Wells Fargo for not getting the records. And I would just caution the court. The Gaither decision is a very narrow decision. I'd caution the court not to go any broader than Gaither. I think if you just adopted Gaither, we would still win. But for Harrison to win here, you've got to go much further than Gaither. And you've got to say that even when the plan document puts the burden on the claimant, and even when you tell the person over and over to produce the relevant records, you still abuse your discretion when you don't go out and hunt for them on top of that. And I think that would be a mistake for the court to do that. It would violate their own precedent and the Supreme Court precedent. I'm way over, so I apologize. Thank you. I want to say one other thing. The record doesn't reflect anything different. But Dr. Patrizzi never cleared her to return to work during that 50-day period. The way it worked, Your Honor, is the surgeon who did the initial thyroidectomy released her to return to Dr. Patrizzi. I understand that. But he never returned her to go to work during that 50-day period. There was no formal release or return to work. There were the records I described earlier. But yes, you're right, Your Honor. Thank you, sir. Thank you. Mr. Hawkins? Your Honors, I'll be very brief. Judge Hamilton, to your point about the August communication about multiple surgeries, it was actually expected and contemplated that multiple surgeries would occur as far back as July 12th. And I'll refer the Court to JA-38, a telephone call between Liberty and Ms. Harrison, where she informed Liberty that her surgeons and her treating physicians had told her that it might require more than one surgery. So that was known to the administrator as far back as mid-July. And with regard to whether or not who had the burden to provide records, certainly Ms. Harrison had that, as the opening plan documents say. But as a fiduciary, the plan administrator, certainly Wells Fargo, had an obligation to engage in a dialogue with Ms. Harrison. And when Dr. Daniels' report comes out, and that's in March of 2012, at that point, the fiduciary, Wells Fargo, knows that it doesn't have records from Dr. Glenn and knows that they are material. At that point, it had notice, constructive, and actual knowledge that it needed to obtain those records. And at that point, it should have told Ms. Harrison, you haven't submitted these specific records, and we're looking at this file, and oh my goodness, we need these records. Dr. Daniels said exactly that much. And when he sent his report to Harriet Myers, she knew those records were required. The plan and Wells Fargo talk about these, quote, normal findings, and we've rebutted them in our papers. But it bears repeating that a normal heart rhythm test says nothing about whether or not a mass is still in existence in Ms. Harrison's chest. There was a, quote, normal chest scan, and this is at J376, but it also reported swelling, mass, or lump in chest and confirmed a five centimeter mass. You look at a normal physical and nervous findings, they have nothing to do. They're missing the inquiry. That's not what she was complaining about for her disability benefits. When they talk about the standard recovery period, and we've addressed this in our papers, but it is arbitrary, capricious, and an abuse of discretion to oppose a one-size-fits-all evidence-based guidelines, which are nowhere in the record, on Ms. Harrison's recovery. It's an individualized inquiry by definition. We don't do that under the ADA. We don't do that under the FMLA. We certainly don't do it under ERISA. In effect, the plan was adding a new plan term. I will say also that in talking about the nurse case manager, the court should take note that they use the same person for both the initial review and the appeal, and that's impermissible under both ERISA's regs and the plan. So even their focus on that gets them nowhere. So with all that said, we asked in our complaint for judgment in our favor. We also asked for a remand because the full and fair review requirements were not met. We would request either of those relief from this court, and we'd ask that the district court's decision be reversed. Thank you. All right, we thank you. We will come down and greet you and then take a brief recess.
judges: J. Harvie Wilkinson III, Robert B. King, Clyde H. Hamilton